United States District Court
For the Northern District of California

1
2
3
4
5            IN THE UNITED STATES DISTRICT COURT
6           FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8    JOY NWABUEZE,                              No. C 09-1529 SI
9              Plaintiff,                       **ORDER GRANTING IN PART AND
                                                DENYING IN PART DEFENDANTS'**
10       v.                                     **MOTION TO DISMISS**
11   AT&T INC., *et al.*,
12             Defendants.
13   _____/
14        Now before the Court is defendants' motion to dismiss plaintiff's first amended complaint.[1]  For
15   the reasons set forth below, defendants' motion is GRANTED IN PART and DENIED IN PART.
16
17                        **BACKGROUND**
18        Plaintiff Joy Nwabueze filed this class action against AT&T Inc., Pacific Bell Telephone
19   Company d/b/a AT&T California ("Pacific Bell" or "AT&T California"), AT&T Services, Inc., and
20   AT&T Operations, Inc. (collectively "AT&T").  The complaint challenges "a particularly abusive
21   practice: the intentional charging of consumers for products and services they have not requested or
22   authorized and the illegal billing and collection of such charges.  The problem lies in business practices
23   AT&T has adopted for billing and collecting on behalf of itself and myriad third-party companies for
24   various third-party products and services." First Amended Compl. ("FAC") ¶ 1.  This practice is known
25   as "cramming." *See generally In the Matter of Long Distance Direct, Inc.*, 14 F.C.C.R. 314, 315, 1998
26   _____
27        [1]  After this motion was submitted, the parties withdrew the motion while pursuing settlement
     negotiations.  Those negotiations proved unsuccessful, defendants re-noticed the motion, and the parties
28   have submitted supplemental authority.

WL 1059642 (F.C.C. Dec. 16, 1998) (defining cramming as: "the practice of including, placing, or submitting unauthorized, misleading, or deceptive charges for products or services on an end-user consumer's telephone bill.").

AT&T, Inc. is a Delaware Corporation with headquarters in Dallas, Texas and is the largest provider of wireline telephone service in the country.  FAC ¶ 9.  AT&T, Inc. conducts significant business in California yet it claims to "own (directly) no telephone poles, no lines, no switching stations; it purports to have no employees." *Id.* ¶ 10.  AT&T conducts its business through its many subsidiaries including AT&T Services, AT&T Operations, and the AT&T local exchange carriers ("LECs").  *Id.* AT&T Services, Inc. ("AT&T Services") is a Delaware Corporation, registered to do business in California, and is a wholly owned subsidiary of AT&T, Inc.  *Id.* ¶ 11.  AT&T Services manages customer billing and collections on behalf of AT&T, Inc.  This includes management of online billing and payments and administration of the AT&T website.  *Id.*  AT&T Operations, Inc. ("AT&T Operations") is a Delaware Corporation, registered to do business in California.  AT&T Operations enters into billing and collection service contracts with various billing aggregation companies ("billing aggregators") on behalf of the AT&T local exchange carriers ("LECs").  *Id.* ¶ 12.   Pacific Bell is a California corporation with headquarters in San Francisco.  AT&T California is an LEC that directly bills its customers for charges passed on to it by billing aggregators and third-party service providers. *Id.* ¶ 13.

AT&T's LECs, such as Pacific Bell, bill and collect revenue on behalf of third-party service providers.  Third-party service providers offer products and services including long distance calling plans and voice mail.  They also provide services that are not directly related to phone use, such as automobile roadside assistance, personalized diet plans, and credit rating repair.  *Id.* ¶¶ 20-23.  These products and services are typically subscription-based, automatically renew, and appear on customer's AT&T telephone bills.  *Id.* ¶ 24.

AT&T is compensated for the billing and collection services it provides on behalf of the third-party service providers by retaining a portion of the amounts billed to the customers.  *Id.* ¶ 25.  "Due to costs and other factors, only the largest third-party service providers are able to bill directly through AT&T." *Id.* ¶ 26.  Most bill through billing aggregators.  "Billing aggregators act as intermediaries

between the service providers and LECs, opening the gate to the LECs' telephone billing and collection system for service providers by contracting with the LECs to have charges on behalf of their service provider clients placed on consumers' telephone bills and to have the LECs collect those charges." *Id.* ¶ 26. "AT&T typically purchases the accounts receivable from the billing aggregators and other billers, bills and collects from its customers and then through a system of allowances and refunds effectively remits to the billing aggregators and other billers the amount of the collected sums minus its cut." *Id.* ¶ 25. AT&T requires that all billing aggregators provide bills in a "standardized, systemized computerized format" specified by AT&T. *Id.* ¶ 26. Billing aggregators are compensated based on a portion, usually a percentage, of the revenue collected from the bills that they submit to AT&T. *Id.* ¶ 27. The balance is then forwarded to the third-party service providers after AT&T and the billing aggregators have taken their shares. *Id.* ¶ 28.

The complaint alleges that AT&T's LEC third-party billing system lacks sufficient safeguards to prevent the billing and collection of unauthorized charges to wireline customers, and that defendants have not erected greater safeguards because they profit from unauthorized billing. *Id.* ¶ 31. "Unlike transactions made using checks and credit cards, which use signatures, highly private account numbers and various other security measures, under the system used by AT&T the only thing a billing aggregator or service provider needs in order to be able to charge a consumer for its products and services is a telephone number. Once the service provider or billing aggregator has the number, they can submit it to the LEC directly, or via a billing aggregator, to initiate billing for services." *Id.* ¶ 33. The complaint alleges that there are numerous mechanisms that AT&T could put into place to protect against the billing and collection of unauthorized charges, but that "[n]onetheless, AT&T continues to bill and collect third-party charges, without taking sufficient steps to ensure that such charges have in fact been authorized by the person legally empowered to authorize charges billed to that number." *Id.* ¶ 41. Plaintiff alleges that AT&T knows, or is reckless in not knowing, that its third-party billing and collection system is subject to widespread abuse, and that it has, in fact, been so abused. *Id.* ¶ 39. AT&T has allegedly collected millions of dollars from the billing of unauthorized charges. *Id.* ¶¶ 37-41.

The complaint alleges that "AT&T has a policy and practice of not obtaining valid authorizations directly from its telephone customers, but purports to rely upon its billing aggregators and/or third-party

**United States District Court**
For the Northern District of California

services providers to obtain such authorizations, even though it knows or is reckless in not knowing that the billing aggregators and/or third-party service providers are not obtaining such authorizations." *Id*. ¶ 42.  The complaint alleges that AT&T uses a standardized contract with its billing aggregators that purports to shift the burden to the billing aggregators to submit billing only from third-party providers who represent that they will only submit billing based upon valid authorizations. *Id*. "AT&T places this responsibility-shifting language into its contracts with the billing aggregators so as to seek to give it plausible deniability with respect to the unauthorized charges for which it bills its customers that it knows or is reckless in not knowing are not based on valid authorizations." *Id*.  Plaintiff alleges that AT&T's conduct is a "deliberate and willful scheme to cheat large numbers of people out of small amounts of money." *Id*. ¶ 45.  Plaintiff further alleges that "because the amount of these charges is small on an individual basis – as little as a few dollars to at most several hundred dollars per customer over the course of a year – and because of AT&T's and the billing aggregators' vast resources and superior bargaining power, AT&T and the billing aggregators employ this scheme with the expectation that their illegal conduct will, if detected, go unpunished." *Id*. ¶ 46.

Plaintiff alleges that "AT&T's billing and collection of unauthorized charges is further exacerbated by the misleading and deceptive nature of the telephone bills it uniformly sends to customers.  AT&T's telephone bills are misleading and deceptive in that consumers are led to believe that the charges on the bill are legitimate by the very fact of their inclusion in the amount indicated as owed to AT&T on the bill.  The placing of a charge for products or services on a telephone bill is a representation that the subscriber has in fact authorized any such charge included on the bill and actually owes that sum." *Id*. ¶ 52.  Plaintiff also alleges that "[t]he charges that appear on customers' bills are not sufficiently identified or explained; thus, a reasonable consumer cannot determine whether he or she actually requested and received the services for which the charge is made," *id*. ¶ 54, and that the bills "uniformly contain misleading and/or unclear descriptions of the manner in which disputes regarding the third-party charges could be addressed and lack sufficient information (such as the date the charges were authorized, the manner in which they were authorized, the name of the person who authorized the charges, etc.) such that reasonable customers could inquire about, or contest, charges on the bill." *Id*. ¶ 55.

Plaintiff Joy Nwabueze was at all relevant times an AT&T local wireline customer. *Id.* ¶ 56. AT&T mailed plaintiff her bill each month, and the amount owed was withdrawn directly from plaintiff's checking account through an automatic bill payment system. *Id.* ¶ 57. Plaintiff noticed unauthorized charges on both her November and December 2008 bills. *Id.* ¶ 58. Both charges were for $12.95 and were reportedly made on behalf of a third-party service provider known as "Voicemail Club." *Id.* Plaintiff alleges that she is the only person with authority to authorize charges to her telephone bill, and that she never authorized these charges from Voicemail Club. *Id.* ¶ 59. Plaintiff has not yet been fully refunded for these charges and, despite having provided notice to AT&T, has not received assurances that her future bills will not contain additional unauthorized charges. *Id.* ¶ 60.

Plaintiff seeks to represent a nationwide class of all AT&T local wireline customers with respect to whom AT&T billed charges for third-party products and services using its billing and collection system. *Id.* ¶ 61. Plaintiff also seeks to represent a California sub-class of similar AT&T local wireline customers. *Id.* ¶ 62. The complaint alleges the following causes of action: (1) violation of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (2) conspiracy to violate RICO, 18 U.S.C. § 1962(d); (3) violation of the Communications Act of 1934, 47 U.S.C. § 201 *et seq.*, and the Truth-in-Billing Regulations, 47 C.F.R. § 64.2401; (4) breach of contract; (5) tortious interference with contract; (6) breach of trust[2]; (7) violation of California Public Utilities Code § 2890; and (8) violation of California Business and Professions Code § 17200. The complaint seeks, *inter alia*, damages and "an injunction prohibiting Defendants from continuing their conduct complained of herein." FAC Prayer for Relief ¶¶ 3, 6.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff

---

[2] Although the complaint states the claim as "breach of trust," it is evident from the parties' briefing on the motion to dismiss that plaintiff's claim is actually for breach of fiduciary duty.

**United States District Court**
For the Northern District of California

to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Although courts do not require "heightened fact pleading of specifics," *Twombly*, 550 U.S. at 544, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," *id.* at 555. The plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Id.*

In deciding whether the plaintiff has stated a claim, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in his or her favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *St. Clare v. Gilead Scis., Inc. (In re Gilead Scis. Sec. Litig.)*, 536 F.3d 1049, 1055 (9th Cir. 2008). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 129 S. Ct. at 1949.

If the Court dismisses a complaint, it must decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## DISCUSSION

## I.    Racketeer Influenced Corrupt Organizations Act ("RICO")

Plaintiff's first and second causes of action allege violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. RICO grants a private right of action to any person "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The first cause of action alleges a violation of 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The second cause of action alleges a violation of 18 U.S.C. § 1962(d), which provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

"[T]he survival of plaintiffs' claim under § 1962(c) will ensure the survival of their claim under § 1962(d)," *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc), and thus the Court only addresses whether plaintiff has stated a claim under § 1962(c). To state a claim under § 1962(c), plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (citing 18 U.S.C. §§ 1964(c), 1962(c)). "Racketeering activity" is any act indictable under several provisions of Title 18 of the United States Code.

Plaintiff alleges that defendants committed the "predicate acts" of mail fraud, bank fraud, and wire fraud "by knowingly and intentionally implementing [a] scheme to bill and collect . . . for unauthorized charges from its customers." FAC ¶ 88. Defendants allegedly did this by using the mails and wire communications to: (1) bill customers for "phony, unauthorized charges," (2) collect payments from those customers, and (3) communicate with the billing aggregators and third party service providers. *Id.* ¶¶ 89-92. Plaintiff alleges that these predicate acts comprise a "pattern of racketeering activity" and that defendants, the billing aggregators, and the third party service providers comprise an "enterprise" as defined in the RICO statute. *Id.* ¶¶ 83-92.

Defendants contend that plaintiff's allegations of wire, mail, and bank fraud are not stated with particularity as required by Federal Rule of Civil Procedure 9(b). Rule 9(b) provides that "In all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. Proc. 9(b). Rule 9(b) "requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir.1986) (internal quotation marks omitted). "[T]he pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Id.* at 1401. "While the factual circumstances of the fraud itself must be alleged with particularity, the state of mind – or scienter – of the defendants may be alleged generally." *Odom*, 486 F.3d at 554.

7

United States District Court

For the Northern District of California

1    The gravamen of plaintiff's fraud allegations is that "AT&T's telephone bills are misleading and

2  deceptive in that consumers are led to believe that the charges on the bill are legitimate by the very fact

3  of their inclusion in the amount indicated as owed to AT&T on the bill.  The placing of a charge for

4  products or services on a telephone bill is a representation that the subscriber has in fact authorized any

5  such charge included on the bill and actually owes that sum."  FAC ¶ 52; *id*. ¶ 53 ("AT&T bills

6  customers for charges and represents to them that they owe money (*i.e.*, charges were authorized) when

7  AT&T either knows that the charges were not authorized or acts in reckless disregard of the likelihood

8  that the charges were not authorized.").  Plaintiff's opposition confirms that these allegations are the

9  basis of the fraud: "the FAC clearly and specifically alleges the nature of the mail, wire and bank fraud

10  by the uniform and false representation in all of defendants' bills that the amounts billed and collected

11  are authorized and owed by the customer."  Opposition at 8:7-9 (citing FAC ¶¶ 1-4, 52-53, 56-59).

12  Plaintiff also asserts that the FAC alleges the specific facts with regard to the plaintiff by alleging the

13  dates of the two specific bills and the amounts of the two fraudulent charges.  FAC ¶¶ 56-59.

14    The Court finds that these allegations are sufficient.  The FAC alleges that defendants

15  implemented a scheme to defraud by billing and collecting for charges that they knew were

16  unauthorized and were not owed. Defendants' reliance on *Katzman v. Victoria's Secret Catalogue*, 167

17  F.R.D. 649 (S.D.N.Y. 1996), is unavailing.  In *Katzman*, the plaintiffs alleged that "the catalogs contain

18  the representation that 'all the prices and deals in the Catalogues are the same for all those who receive

19  them.'" *Id*. at 655.  The court found those allegations insufficient to state a RICO claim because the

20  plaintiffs "have not, and cannot, point to any language in a VSC catalogue which actually makes such

21  a statement.  Moreover, they have not provided any basis upon which the language contained in the

22  catalogues could be construed as making such a representation."  *Id*. at 655-56. Here, the FAC alleges

23  that defendants intentionally charge consumers for products and services that they have not requested

24  or authorized, and the FAC contains detailed allegations about, *inter alia*, the numerous sources putting

25  defendants on notice of the widespread incidence of authorized third-party billing.

26    Defendants also assert that plaintiff has not sufficiently alleged a "criminal enterprise" under

27  RICO.

28    Here, plaintiff alleges that the criminal enterprise included defendants AT&T, Inc., AT&T

8

Services, AT&T Operations and AT&T California as well as billing aggregators and hundreds of third party service providers for which AT&T provided third party billing services.   FAC ¶ 83.  Plaintiff alleges that each member of the enterprise played a role in obtaining, transmitting, billing and collecting "phony, unauthorized charges on AT&T's bills under the direction of AT&T and pursuant to its scheme to bill and collect millions of dollars for unauthorized charges from AT&T's customers." *Id.* ¶ 84. Plaintiff further alleges that:

> AT&T adopted and implemented one centrally managed, uniform, nationwide scheme to defraud its customers by billing and collecting a percentage of bogus and unauthorized charges from its customers, and for the purposes of implementing this fraudulent scheme AT&T associated itself with the billing aggregators and third party providers by entering into dozens of virtually identical contractual relationships with billing aggregators operating nationwide setting forth the terms and conditions upon which the billing aggregators, and in turn, the third party providers, would be permitted to utilize AT&T's billing and collection system for purposes of submitting the bogus and unauthorized charges to AT&T's customers, while simultaneously permitting AT&T to falsely claim that it was the billing aggregators and the third party providers, not AT&T, that submitted the bogus unauthorized charges.  As part of the scheme, AT&T shares with the billing aggregators and third party providers a portion of the proceeds of the fraudulent, bogus, unauthorized charges that AT&T bills and collects from its customers through the fraudulent scheme [] that inures to the benefit of AT&T.

FAC ¶ 85.

Defendants argue that plaintiff's allegations are similar to those found deficient in *In re Jamster Marketing Litigation*, No. 05cv0819 JM(CAB), 2009 WL 1456632 (S.D. Cal. May 22, 2009).  In *Jamster*, mobile telephone service customers brought a RICO claim against wireless providers and content providers.  The plaintiffs alleged that the content providers "engaged in fraudulent advertising and agreed with Wireless Providers to bill mobile service customers for services and content which they had not authorized and/or requested . . . [and] colluded with Wireless Providers to share revenues that were collected as part of the enterprise." *Jamster*, 2009 WL 1456632, at *5.  The *Jamster* plaintiffs further described the scheme as follows: "Content Providers would advertise the services which would lead to fraudulent charges, and the Wireless Providers would actually bill and collect the payments from customers, keep a portion for themselves as payment for their part in the fraudulent enterprise and pay the remainder to the Content Providers." *Id.* at *6.  The court dismissed the plaintiff's complaint.

> [Plaintiff's] allegations fail to particularly establish that Wireless Providers and Content Providers had the common purpose of increasing their revenues by fraudulent means. Further, the court notes that [plaintiffs] fail to allege that AT&T created, sponsored, approved, or otherwise adopted the alleged deceptive advertising issued by Content

United States District Court
For the Northern District of California

1   Providers.

2   *Id.* at *6-7 (internal formatting omitted).  For reasons articulated below, the Court finds *Jamster*

3   distinguishable.

4   An enterprise is defined as "any individual, partnership, corporation, association, or other legal

5   entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C.

6   § 1961(4).  The Supreme Court has identified a RICO enterprise as "a group of persons associated

7   together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S.

8   576, 583 (1981).  The Ninth Circuit recently held that to meet the "enterprise" element of a RICO claim,

9   a plaintiff must allege facts that will demonstrate (1) that defendant has "associated for a common

10  purpose of engaging in a course of conduct"; (2) that there is an "ongoing organization either formal or

11  informal" which "is a vehicle for the commission of two or more predicate crimes"; and (3) "that the

12  various units function as a continuing unit," meaning that the "associates' behavior was ongoing rather

13  than isolated activity."  *Odom*, 486 F.3d at 553.

14  The Court finds that plaintiff's allegations of an enterprise are sufficient, and on this point agrees

15  with Judge Armstrong's analysis of substantially similar RICO allegations in *Moore v. Verizon*

16  *Commc'ns Inc.*, C 09-1823 SBA, 2010 WL 3619877 (N.D. Cal. Sept. 10, 2010), a case which

17  challenges Verizon's third-party billing practices. Judge Armstrong denied the defendants' motion to

18  dismiss the RICO claim, and distinguished *Jamster*:

19  While the general nature of this case is similar to that of *Jamster*, Plaintiffs'
    allegations here are more particularized with respect to the enterprise's common purpose.

20  For example, the instant Plaintiffs allege that the enterprise worked together to create,
    implement, and share the profits of the fraudulent scheme, the success of which

21  depended upon the active and knowing participation of Defendants and the aggregators
    and service providers.  (*See* FAC ¶¶ 1-4, 38-41, 50-58, 61-63.)  Plaintiffs further allege

22  that Defendants could not have implemented the fraudulent scheme without the service
    providers originating the fraudulent charges; and the aggregators and service providers

23  could not have implemented the fraudulent scheme without Defendants' agreement to
    purchase, bill, and share the profits from the unauthorized fraudulent charges and

24  Defendants' refusal to insist upon antifraud provisions in the contracts with the
    aggregators and service providers.  (*Id*.)

25
    Moreover, Plaintiffs allege that the Defendants, the billing aggregators, and

26  service providers exploited Defendants' faulty billing practices, which allowed for the
    placement of unauthorized charges on customers' bills: "All the way up and down the

27  line, Verizon, the billing aggregators and the third-party providers know that the billing
    and collection system used lacks sufficient checks and safeguards to prevent

28  unauthorized charges from being added to customers' wireline telephone bills – indeed,

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  to the contrary, they all know that there is a significant likelihood of unauthorized
2  charges, given the system presently used – and they have knowingly exploited those
   defective systems to implement and carry out their fraudulent scheme." (*Id*. at ¶ 6.)  In
3  sum, Plaintiffs' particularized allegations regarding the enterprise's deliberate
   exploitation of Defendants' faulty billing practices to further their common purpose – to
4  enable collection of millions of dollars in fraudulent charges – are sufficient at the
   pleading stage to allege an associated-in-fact enterprise.

5  *Id*. at *4-6.

6      Judge Armstrong found the allegations in *Moore* more analogous to *Odom*, 486 F.3d 541 (9th

7  Cir. 2007).  In *Odom*, the plaintiffs alleged that the "defendants had the common purpose of increasing

8  the number of people using Microsoft's Internet Service, and doing so by fraudulent means.  Best Buy

9  furthered this common purpose by distributing Microsoft Internet Trial CD's and conveying its

10 customers' debit and credit card information to Microsoft.  Microsoft then used the information to

11 activate customer accounts."  *Id*. at 552.  In denying the defendants' motion to dismiss the RICO claim,

12 the Ninth Circuit explained "[t]hese allegations are more than adequate to establish, if true, that

13 Microsoft and Best Buy had a common purpose of increasing the number of people using Microsoft's

14 Internet service through fraudulent means."  *Id*.  Here, as in *Odom*, plaintiffs have alleged that the

15 enterprise knowingly exploited defendants' defective third-party billing and collecting system to place

16 unauthorized charges on customers' accounts.  Accordingly, the Court DENIES defendants' motion to

17 dismiss the RICO claim.

18

19 **II.    Communications Act**

20     **A.    47 U.S.C. § 201**

21     Plaintiff's third cause of action alleges that defendants have violated Section 201 of Title II of

22 the Federal Communications Act, 47 U.S.C. § 201, and the "Truth-in-Billing" regulations adopted by

23 the Federal Communications Commission ("FCC"), 47 C.F.R. § 64.2401.  Plaintiff alleges that

24 defendants violated Section 201 by billing for an unjust or unreasonable charge in connection with an

25 interstate communication service.  Section 201(b) provides:

26     (b)  All charges, practices, classifications, and regulations for and in connection with
        such communication service [*i.e.*, interstate or foreign communication by wire or radio],
27     shall be just and reasonable, and any such charge, practice, classification, or regulation
        that is unjust or unreasonable is declared to be unlawful. . . .
28

11

47 U.S.C. § 201(b).  Plaintiff alleges that defendants' practice of billing and collecting unauthorized third-party charges is "unjust" and "unreasonable," and therefore violates this statute.  FAC ¶ 109.

Defendants contend that this claim fails as a matter of law because Section 201(b) does not apply to third-party billing and collection services.  Defendants argue that the conduct alleged here – improper billing for services provided by third parties – is outside the scope of Section 201(b) because the activity is neither "for" nor "in connection with" the provision of any interstate communication service by Pacific Bell.

Defendants rely on *Brittan Communications International Corporation v. Southwestern Bell Telephone Company*, 313 F.3d 899 (5th Cir. 2002), *cert. denied*, 538 U.S. 1034 (2003).  In *Brittan*, the defendant local telephone company provided third-party billing and collection services for the plaintiff long-distance company.  After receiving customer complaints about cramming, the defendant suspended billing and collection services for the plaintiff, and the plaintiff sued.  The plaintiff alleged that the suspension of billing and collection services violated Section 202(a) of Title II.  The district court granted judgment on the pleadings in favor of the defendant, and the Fifth Circuit affirmed.  The court noted that Title II of the Communications Act "outlines the duties of common carriers in the provision of interstate or foreign communications services," and that under FCC precedent, "billing and collection services that do not utilize communications over the common carrier's wire or radio facilities are not 'communication services' regulated by Title II of the Communications Act."  *Id.* at 904.  Instead, the FCC had determined that such billing and collection services are "financial and administrative" services outside the scope of Title II.  *Id.* at 905.  The court noted,

> Brittan has cited no FCC decision in which the FCC has altered its view that billing and collection services provided by LECs to unaffiliated long-distance providers fall outside the scope of Title II.  *See In the Matter of Federal-State Joint Board on Universal Service*, 13 F.C.C. Rcd. 24,744, ¶ 70 & n.87 (1998) (finding that billing and collection services are subject to Title II, but only as to a carrier's own billing and collections).  Likewise, Brittan has cited to no case holding that billing and collection services fall within the scope of Title II.

*Id.* at 905-06; *see also Int'l Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 893 F. Supp. 1207, 1224-25 (S.D.N.Y. 1994) (holding Title II does not regulate billing services that do not utilize communications over the common carrier's wire or radio facilities); *see also Chladek v. Verizon N.Y., Inc.*, 96 Fed. Appx. 19, 22 (2d Cir. 2004) ("Moreover, the FCC has determined that billing and

collection services are not 'telecommunications services' as defined by Title II of the Communications Act.").

Plaintiff contends that the billing and collection services at issue here are covered by Title II because the FAC alleges that defendants purchase the accounts receivable from the aggregators and third-party providers, and then bill their customers and collect from them for those charges. *See* FAC ¶ 25 ("AT&T typically purchases the accounts receivable from the billing aggregators and other billers, bills and collects from its customers and then through a system of allowances and refunds, effectively remits to the billing aggregators and other billers the amount of the collected sums minus its cut."). Thus, plaintiff contends, the FAC challenges the "carrier's own billing and collections," which *Brittan* recognized was covered by Title II. *Brittan*, 313 F.3d at 905-06. Plaintiff does not cite any authority for the proposition that third party billing and collection services are covered by Title II if the carrier first purchases the accounts from the third parties.

The Court concludes that under *Brittan* and the FCC precedent discussed therein, billing for third party services is not subject to regulation under Title II. As *Brittan* makes clear, what the FCC found determinative was whether the services at issue "utilize communications over the common carrier's wire or radio facilities." *Id.* at 904. Regardless of whether defendants purchase the third party accounts receivable prior to billing customers for the third party services, the nature of the services is the same: the services are rendered by third parties, and do not "utilize communications over the common carrier's wire or radio facilities." *Id.*; *see also Int'l Audiotext Network*, 893 F. Supp. at 1224 ("The relevant principle that can be extracted from these FCC decisions is that it is communications services that are regulated by Title II of the Communications Act, and that 'billing services' that do not utilize communications over the common carrier's wire or radio facilities are not."). Accordingly, the Court GRANTS defendants' motion to dismiss this claim without leave to amend.

**B.      Truth-in-Billing Requirements, 47 C. F. R. § 64.2401**

Plaintiff's third cause of action also alleges a violation of the "Truth-in-Billing Requirements," 47 C. F. R. § 64.2401. Specifically, plaintiff alleges that defendants violated subsections (b) and (d) of that regulation. Those subsections provide,

(b) Descriptions of billed charges.  Charges contained on telephone bills must be accompanied by a brief, clear, non-misleading, plain language description of the service or services rendered.  The description must be sufficiently clear in presentation and specific enough in content so that customers can accurately assess that the services for which they are billed correspond to those that they have requested and received, and that the costs assessed for those services conform to their understanding of the price charged.

. . .

(d) Clear and conspicuous disclosure of inquiry contacts.  Telephone bills must contain clear and conspicuous disclosure of any information that the subscriber may need to make inquiries about, or contest, charges on the bill.  Common carriers must prominently display on each bill a toll-free number or numbers by which subscribers may inquire or dispute any charges on the bill.  A carrier may list a toll-free number for a billing agent, clearinghouse, or other third party, provided such party possesses sufficient information to answer questions concerning the subscriber's account and is fully authorized to resolve the consumer's complaints on the carrier's behalf.  Where the subscriber does not receive a paper copy of his or her telephone bill, but instead accesses that bill only by e-mail or internet, the carrier may comply with this requirement by providing on the bill an e-mail or web site address.  Each carrier must make a business address available upon request from a consumer.

47 C.F.R. § 2401(b), (d).  The FAC alleges that "[t]he charges contained on Defendants' bills were not accompanied by 'clear, non-misleading, plain language description of the service or services rendered' nor did they 'contain clear and conspicuous disclosure of any information that the subscriber may need to make inquiries about, or contest, charges on the bill,' in violation of 47 C.F.R. § 64.2401."  FAC ¶ 111.

Defendants contend that the Truth-in-Billing regulations only apply to a carrier's billing for its own telecommunications services, and do not apply to billing for the services of a third party. Defendants cite the FCC's order adopting the Truth-in-Billing regulations, in which the FCC explained,

[The FCC] has jurisdiction under Title II to regulate the manner in which a carrier bills and collects for its own interstate offerings, because such billing is an integral part of that carrier's communications service.  The guidelines adopted here apply to the carrier providing service to customers, not to those carriers' billing agents.  Thus, for example, even where an interexchange carrier (or other carrier) uses the billing and collection services of a LEC or other third-party billing agent, the interexchange carrier still bears the responsibility of ensuring that such charges appear on the bill remitted to the consumer in a manner that complies with the principles set forth in this Order.  The Commission's Detariffing Order specifically stated that a carrier's billing and collection for its own service, as opposed to billing services provided to other carriers, is subject to the Commission's Title II jurisdiction.

*In the Matter of Truth-in-Billing and Billing Format*, 14 F.C.C.R. 7492, 7506-07 ¶ 25 (May 11, 1999).

Plaintiff's opposition does not address the Truth-in-Billing regulations, and thus appears to

14

concede the inapplicability of 47 C.F.R. § 64.2401 to the billing and collecting activities at issue.  The Court agrees with defendants that this regulation applies to "a carrier's billing and collection for its own service, as opposed to billing services provided to other carriers," *id*., and thus does not apply to defendants' billing and collection for third party services.  Accordingly, the Court DISMISSES plaintiff's claim without leave to amend.

### III.    State law claims

####      A.    Exclusive jurisdiction

Defendants contend that plaintiffs' state law claims should be dismissed because they are within the exclusive jurisdiction of the California Public Utilities Commission (CPUC).  The CPUC is a state agency that derives its authority from the California Constitution. Cal. Const. Art. XII, §§ 1-6.  The CPUC has authority over "[p]rivate corporations . . . that own, operate, control or manage a line . . . or system . . . for the . . . transmission of telephone and telegraph messages." *Id.* at § 3. "The commission may fix rates, establish rules, examine records, issue subpoenas, administer oaths, take testimony, punish for contempt, and prescribe a uniform system of accounts for all public utilities subject to its jurisdiction." *Id.* at § 6.

The California legislature has delegated authority to the CPUC to regulate the third-party billing practices complained of in this action – namely cramming. *See e.g.* Cal. Pub. Util. Code §§ 2889.5, 2890(a), 2889.9(a), 2889.9(I), and 2890.1.  Pursuant to this authority, in early 2000 the CPUC initiated a rulemaking proceeding (R.00-02-004) to establish consumer protection rules, including rules related to third-party billing. *See* Stats 2000, ch. 931 Section (c).   In 2001, the CPUC issued its First Interim Decision imposing interim rules, implementing what the CPUC described as the "anti-cramming" legislation codified in Sections 2889.0 and 2890 of the Public Utilities Code.  Dec. No. 01-07-030, *Interim Opinion Adopting Interim Rules Governing the Inclusion of Non-Communications-Related Charges in Telephone Bills* (July 12, 2001), at 2 (hereinafter "Interim Non-Com Rules").[3]  Following

---

[3]  Although the third-party billing rules developed in the CPUC's rulemaking initially applied only to the third party billing of non-communication related-services and products, the third party billing rules ultimately adopted by the CPUC, and in place currently, apply to all third party billing, whether

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

an evaluation of that initial decision, the CPUC adopted a Second Interim Decision in May 2004. *See* Dec. No. 04-05-057, *Interim Decision Issuing General Order 168, Rules Governing Telecommunication Consumer Protection* (May 27, 2004). Shortly thereafter, the CPUC stayed the Second Interim Decision pending further examination, in part because carriers were experiencing difficulties making the "substantial and complex changes to carrier billing systems, computer systems or contracts for vendor services" required by those interim rules. *Id*. at 2-3.

On March 2, 2006, the CPUC issued Decision No. 06-03-013, the current version of the third party billing and cramming rules. Dec. 06-03-013, *Decision Issuing Revised General Order 168, Market Rules to Empower Telecommunications Consumers and to Prevent Fraud* (Mar. 2, 2006) (hereinafter "Dec. 06-03-313") (found at Docket No. 45). In that Decision, the CPUC repealed the "Interim Non-Com Rules," which had, *inter alia*, directed carriers to obtain their subscribers' prior written authorization before placing non-communications-related charges on their subscribers' bills, and mandated the use of a personal identification number (PIN) or equivalent security device before subscribers could initiate a transaction that results in a non-communications-related charge being placed on a phone bill. *Id*. at 79 (describing Interim Non-Com Rules). In repealing the Interim Non-Com Rules, the CPUC stated, *inter alia*, that "we recognize that key elements of the Interim Non-Com Rules, namely the 'opt-in' and 'PIN' requirements, may be inconvenient for consumers and unduly burdensome for carriers," and the CPUC found it significant that in the four years that the Interim Rules had been in place, no carrier had elected to offer this billing service pursuant to the requirements imposed by the Non-Com rules. *Id*. at 85-86. The CPUC also found that repeal of the Interim Non-Com Rules "likely will not result in any significant detriment to consumers" and that "[c]onsumers continue to benefit from significant statutory protections. The protections in P.U. Code §§ 2889.9 and 2890 forbid placement of unauthorized charges on a telephone bill, prohibit disconnection of local service for nonpayment of any non-communications charge, require disclosure of how to resolve a cramming complaint, and provide a means for expeditiously resolving a dispute regarding an allegedly unauthorized charge." *Id*.

---

for communications or non-communications services and products. *See* Dec. 06-03-013, *Decision Issuing Revised General Order 168, Market Rules to Empower Telecommunications Consumers and to Prevent Fraud* (Mar. 2, 2006), at 10-16 (hereinafter "Dec. 06-03-313").

United States District Court
For the Northern District of California

at 88-89. The CPUC also noted that "Laws of general applicability, such as contract law and Bus. & Prof. Code § 17[200], also shield consumers for liability from unauthorized charges." *Id*. at 89 n.250.

In Decision 06-03-013, the CPUC adopted new cramming rules that "address and clarify carriers' responsibilities under existing statutes." *Id*. at 91. The cramming rules provide that "a carrier's responsibility to avoid placing unauthorized charges on its customers' phone bills extends to situations where a charge may originate with a billing agent or third party vendor"; "reiterate and establish guidelines regarding the 'rebuttable presumption that an unverified charge for a product or service was not authorized by the user'"; "make it clear that significant remedies are afforded to consumers who have been crammed"; and "provide that a carrier must resolve a cramming complaint within thirty days of the date the carrier received the complaint." *Id*. at 92-94. The CPUC's decision also states that the cramming rules "shall not be interpreted to create any new private right of action, to abridge or alter a right of action under any other state or federal law, or to create liability that would not exist absent the foregoing rules," *id*. at 62, and that it was the CPUC's intent "to ensure that individuals with grievances based on the G.O. 168 rules come to the Commission for resolution." *Id*. at 59.

In the same decision, the CPUC also adopted additional measures to address cramming, including (1) formal and informal enhanced enforcement of the anti-cramming regulations, (2) expanding a toll-free hotline "to facilitate rapid identification of telecommunications carriers engaged in fraudulent conduct and to identify fraud," (3) increased cooperation with local law enforcement, (4) further collaboration with federal government officials such as the Federal Communications Commission ("FCC") or Federal Trade Commission ("FTC"), and (5) creation of a special Telecommunications Consumer Fraud Unit. *Id.* at 105-113.

Defendants contend that the CPUC has "occupied the field of third party billing," and thus that this Court lacks jurisdiction over plaintiff's state law claims. Defendants rely on California Public Utilities Code Section 1759, which states:

> No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court.

Cal. Pub. Util. Code § 1759.

**United States District Court**
For the Northern District of California

Section 2106 of the Public Utilities Code, however, creates a private right of actions against utility companies and provides:

> Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was wilful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person.

Cal. Pub. Util. Code § 2106.

The California Supreme Court has held that § 1759 bars private actions against utilities where the relief granted would undermine a regulatory regime established by the CPUC. *San Diego Gas & Elec. Co. v. Superior Court (Covalt)*, 13 Cal. 4th 893, 902-03 (1996).

> [A]n action for damages against a public utility pursuant to section 2106 is barred by section 1759 not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would "reverse, correct, or annul" that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would "hinder" or "frustrate" or "interfere with" or "obstruct" that policy.

*Id*. at 918. "[W]hen the relief sought would have interfered with a broad and continuing supervisory or regulatory program of the commission, the courts have found such a hindrance and barred the action under section 1759." *Id*. at 919; *see e.g.*, *Waters v. Pac. Tel. Co.*, 12 Cal. 3d 1, 10-12 (1974) (holding damage action for negligence in providing telephone service conflicted with PUC-approved tariff limiting telephone customer to credit allowance for improper service). However, courts are not prevented from acting in aid of, rather than derogation of the CPUC's jurisdiction. *Hartwell Corp. v. Superior Court*, 27 Cal. 4th 256, 275 (2007).

The California Supreme Court has established a three part test to determine whether Section 1759 precludes an action against a utility: (1) whether the CPUC had the authority to adopt a regulatory policy; (2) whether the CPUC had exercised that authority; and (3) whether the court action would hinder or interfere with the CPUC's exercise of regulatory authority. *See id.* at 266 (citing *Covalt*, 13 Cal. 4th at 923, 926, 935)). Here, the parties agree that the first and second elements have been met, and the dispute focuses on whether this lawsuit would hinder or interfere with the CPUC's exercise of regulatory authority with respect to cramming. Defendants argue that the relief sought in the FAC

United States District Court
For the Northern District of California

1   would undermine, and be inconsistent with, the CPUC's role in significant respects.  Defendants note

2   that plaintiff seeks injunctive relief, and that the complaint challenges the "business practices AT&T

3   has adopted for billing and collecting on behalf of itself and myriad third-party companies," (FAC ¶ 1),

4   AT&T's "computerized, standardized, routenized, systemized billing system" (FAC ¶ 26), AT&T's

5   relationship "with  the third-party providers and aggregators involved in this system" (FAC ¶ 4), and

6   the overall concept of "[u]sing a telephone number as the basis for billing of products and services"

7   (FAC ¶ 34).  Defendants also note that during the rulemaking proceedings, the CPUC considered and

8   rejected the relief sought in the FAC, such as the use of a PIN.  Defendants argue that for this Court to

9   grant injunctive relief that "overhauls" AT&T's billing systems, or to award damages based on the

10  alleged inadequacies of AT&T's system, "it would effectively reverse the CPUC's decision and

11  regulatory framework concerning Public Utilities Code section 2890 by replacing the CPUC's rules with

12  its own."  Motion at 11:10-12.

13          Plaintiff responds that this lawsuit simply seeks to stop defendants' cramming and recover

14  damages for past cramming, and that plaintiff does not ask the Court to impose any set of procedures

15  on AT&T or prescribe the specific steps that defendants must take to avoid the cramming that is taking

16  place.[4]  Plaintiff argues that the FAC's references to specific anti-fraud measures that defendants could

17  take simply demonstrate that there are feasible and effective methods that defendants could implement

18  to stop the cramming, and that those allegations should not be taken as a request for any specific

19  injunctive relief.

20          Both parties rely on *Hartwell Corporation v. Superior Court*, 27 Cal. 4th 256 (2002).  In that

21  case, the plaintiffs sued water providers regulated by the CPUC, as well as industrial entities and water

---

[4]  Relying on *Coolman v. SBC Communications, Inc.*, No. B170464, 2005 WL 120065 (Cal. Ct. App. Jan. 20, 2005), plaintiff also argues that defendants are barred from arguing exclusive jurisdiction based on collateral estoppel.  In *Coolman*, the Court of Appeal rejected AT&T's (then SBC) argument that the CPUC had exclusive jurisdiction over the plaintiff's claims challenging cramming.  The Court finds that *Coolman* does not have a preclusive effect here because plaintiff has not shown that the underlying facts and conditions have remained the same since the *Coolman* decision was rendered.  The *Coolman* decision relied heavily on CPUC's two prior Interim Decisions, discussed *supra*, and *Coolman* was issued before Decision 06-03-013, which was issued in 2006.  *See United States Golf Ass'n v. Arroyo Software Corp.*, 69 Cal. App. 4th 607, 616 (1999) ("Collateral estoppel does not apply where there are changed conditions or new facts which did not exist at the time of the prior judgment, or where the previous decision was based on different substantive law.").

United States District Court
For the Northern District of California

providers not regulated by the CPUC. The plaintiffs sought injunctive relief and damages based on their allegations that certain well water was contaminated. The Supreme Court analyzed whether those claims were subject to the exclusive jurisdiction of the CPUC due to the CPUC's regulation of water quality. The court held that the plaintiffs' claims for damages "on the theory that the public utilities provided unhealthy water, even if that water actually met with DHS and PUC standards, would interfere with a 'broad and continuing supervisory or regulatory program' of the PUC." *Id.* at 276 (quoting *Covalt*, 13 Cal. 4th at 919). "A superior court determination of the inadequacy of a DHS water quality standard applied by the PUC would not only call DHS regulation into question, it would also undermine the propriety of a PUC ratemaking determination" because in determining whether to approve a rate increase, the PUC must consider, *inter alia*, whether treatment facilities are needed, and that determination, in turn, is made by reference to applicable water quality standards. *Id.* In addition, the court noted that as part of the CPUC's regulatory program, the PUC has provided a safe harbor for public utilities if they comply with DHS standards, and "[a]n award of damages on the theory that the public utilities provided unhealthy water, even if the water met DHS standards, 'would plainly undermine the commission's policy by holding the utility liable for not doing what the commission has repeatedly determined that it and all similarly situated utilities were not required to do.'" *Id.* (quoting *Covalt*, 13 Cal. 4th at 950).

In contrast, the court held that the plaintiffs' claims for damages based on the theory that the drinking water failed to meet federal and state drinking water standards were not preempted by Section 1759. *Id.* at 276-77. The court recognized that the PUC had issued a final opinion on water quality in which it made a retrospective finding that the regulated defendants had substantially complied with DHS drinking water standards for the past 25 years. However, that factual finding was not part of a broad and continuing program to regulate public utility water quality, and "[a]lthough a PUC factual finding may be part of a future remedial program, a lawsuit for damages based on past violations of water quality standards would not interfere with such a prospective regulatory program." *Id.* at 277. The court noted that the PUC can redress violations in a variety of ways, "but these remedies are essentially prospective in nature . . . . and do not redress injuries for past wrongs." *Id.* "Here, plaintiffs alleged injuries caused by water that failed to meet state and federal drinking water standards 'for many years.'"

Because the PUC cannot provide for such relief for past violations, those damage actions would not interfere with the PUC in implementing its supervisory and regulatory policies to prevent future harm." *Id*.

The court analyzed the plaintiffs' claims for injunctive relief separately from damages. The plaintiffs sought injunctive relief for current water quality violations. The court held that "a court injunction after a jury finding of DHS standards violations would 'interfere with the commission in the performance of its official duties . . . .' (§ 1759). As part of its water quality investigation, the PUC determined, not only whether the regulated utilities had complied with drinking water standards for the past 25 years, but also whether they were currently complying with existing water quality regulation." *Id*. at 278. As such, "[a] court injunction, predicated on a contrary finding of utility noncompliance, would clearly conflict with the PUC's decision and interfere with its regulatory functions in determining the need to establish prospective remedial programs." *Id*.

Applying the *Hartwell* analysis here, the Court concludes that Section 1759 bars plaintiff's claims for injunctive relief, but not plaintiff's claims for damages. Plaintiff is correct that, unlike *Hartwell*, the CPUC has not specifically found that AT&T's billing and collection practices are in compliance with the CPUC"s cramming rules, or that those practices are otherwise lawful, and thus a court determination that AT&T's practices are unlawful would not present a direct conflict. However, if plaintiff prevails in this case, in order to award injunctive relief the Court would necessarily be required to determine the nature and specifics of defendants' third-party billing practices and issue an order setting forth the revised practices to be followed going forward. For example, the Court would be required to determine whether AT&T's use of a telephone number as a basis for billing of products and services was permissible, and such determinations would interfere with the CPUC's regulatory functions. Plaintiff asserts that the Court could simply order broad injunctive relief that essentially orders defendants to stop cramming. However, "[i]njunctive relief . . . must be tailored to remedy the specific harm alleged." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009); *see also Cook v. Craig*, 55 Cal. App. 3d 773, 786 (1976) ("We may just as readily order the CHP to 'obey all laws.' It is elementary, of course, that such broad orders are not available to plaintiffs or to anyone else."). Plaintiff has not persuasively articulated any form of injunctive relief that this Court could order that

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  would be both meaningful and specific, and that would not intrude on the CPUC's continuing regulatory

2  program.[5]

3       On the other hand, the Court concludes that plaintiff's claims for damages are not barred by

4  Section 1759 because, as in *Hartwell*, a lawsuit for damages based on past cramming violations would

5  not interfere with any prospective regulatory program.  A determination that AT&T's billing practices

6  have resulted in past cramming violations does not in any way affect the CPUC's ongoing regulation

7  of the industry.  As the *Hartwell* court recognized, "[b]ecause the PUC cannot provide for such relief

8  for past violations, those damage actions would not interfere with the PUC in implementing its

9  supervisory and regulatory policies to prevent future harm."  27 Cal. 4th at 277.  In contrast, the

10 damages claim in *Waters v. Pacific Bell Co.*, 12 Cal. 3d 1 (1974), was barred by Section 1759 because

11 there the plaintiff sued a telephone company for failing to furnish adequate telephone service.  The

12 California Supreme Court noted that "the commission has adopted a policy of limiting the liability of

13 telephone utilities such as Pacific for acts of ordinary negligence to a specified credit allowance, as set

14 forth in approved tariff schedules which form a contract with telephone service customers.  Since an

15 award of substantial damages to plaintiff would be contrary to the policy adopted by the commission

16 and would interfere with the commission's regulation of telephone utilities, we have concluded that

17 section 1759 bars the instant action."  *Waters*, 12 Cal. 3d at 4.  Here, a finding of liability would not be

18 contrary to any policy adopted by the CPUC or otherwise interfere with the CPUC's regulation of

19 telephone utilities.

20      Defendants argue that the CPUC has expressed a clear intent that it be the forum where all

21 grievances about cramming are resolved, and they cite Decision 06-03-013.  In that decision, the CPUC

22 stated, *inter alia*, that "[w]e have expertise in the telecommunications industry, and we know how

23 resolution of an individual matter may affect our continuing policies and programs," "[t]he

24 Commission's ability to provide consumers appropriate redress obviates any need for private litigation,"

25 and "We are concerned that private litigation may undermine the effectiveness of the Commission."

26 _____

27     [5] Plaintiff also asserts that CPUC jurisdiction would be limited to Pacific Bell, which is the only
   regulated defendant.  However, as defendants note, the alleged liability of the non-regulated defendants
28 is based solely on how their conduct impacts Pacific Bell's third party billing practices, which the CPUC
   regulates.

Dec. No. 06-03-013 at 59-60.  However, those statements were made specifically with regard to "the extent to which these rules may be the basis of court action by private individuals or public law enforcement officials."  *Id.* at 59.  The CPUC did not state that it had exclusive jurisdiction to review any and all grievances related to cramming.  Moreover, plaintiff does not allege any claims based on the CPUC's cramming rules, and instead alleges claims based on violations of state law.

### B.        Primary jurisdiction

Alternatively, defendants contend that even if the Court has concurrent jurisdiction over plaintiffs' state law claims, the Court should invoke the primary jurisdiction doctrine and refuse to exercise its jurisdiction.  "The doctrine of primary jurisdiction of regulatory agencies (also known as the doctrines of prior resort and preliminary jurisdiction) is concerned with situations where an issue should be addressed by an administrative agency for its initial determination because there is a need for (1) uniformity of application of administrative regulations and uniformity of answers to administrative questions, and (2) the expert and specialized knowledge of the relevant agency, i.e., the expertise that a regulatory agency can bring to a conflict."  *Cundiff v. GTE California, Inc.*, 101 Cal. App. 4th 1395, 1412 (2002) (citing *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 386-90 (1992)).

In light of the Court's conclusion that plaintiff's state law claims for injunctive relief are subject to the CPUC's exclusive jurisdiction, the question is whether the Court should decline jurisdiction over the damages claims in order to allow plaintiff to first seek relief from the Commission.  As stated above, the Court agrees that the CPUC is in the best position to determine whether defendants' specific practices comply with the CPUC's rules and regulations.  However, plaintiff's damages claims do not implicate those rules and regulations, and instead are predicated on whether defendants have violated state law.  Accordingly, the Court finds it appropriate to retain jurisdiction over plaintiffs' state law damages claims.

In summary, the Court concludes that plaintiff's state law claims for injunctive relief are subject to the exclusive jurisdiction of the CPUC, and the Court exercises jurisdiction over plaintiff's state law claims for damages.

United States District Court

For the Northern District of California

**C.      12(b)(6) analysis**

Defendants also contend that each of plaintiff's state law claims fails as a matter of law.

**1.      Breach of contract**

Plaintiff's fourth cause of action is for breach of contract.  Plaintiff alleges that "Plaintiff and the Classes and Sub-Class entered into agreements with Defendant AT&T California whereby Plaintiff and the respective classes agreed to pay a certain sum of money in exchange for AT&T's activation of Plaintiff's and the sub-class's local wireline telephone account and its promise to provide various communication and related services to Plaintiff and the Sub-Class." FAC ¶ 115.  The complaint further alleges that AT&T California expressly and/or impliedly agreed to bill and collect only for authorized charges, and expressly and/or impliedly agreed to provide clear and non-misleading phone bills. *Id*. ¶¶ 116-17.   Plaintiff alleges that AT&T breached these obligations by billing and collecting for unauthorized products and services, and by providing telephone bills that were unclear and misleading. *Id*. ¶¶ 119-20.   Plaintiff also alleges that AT&T California/Pacific Bell breached its contractual obligation of good faith and fair dealing by billing and collecting for unauthorized charges. *Id*. ¶ 119.

Defendants move to dismiss the breach of contract claim on the ground that Pacific Bell's sole contractual obligations toward plaintiff are contained in its tariff filed with the CPUC, and according to defendants, the tariff only applies to Pacific Bell's provision of residential telephone services, and does not apply to third party services or the billing thereof.  Plaintiff responds that her allegations are sufficient under Rule 8, and that defendants are inappropriately going beyond the pleadings.  Plaintiff also asserts that as a factual matter defendants are incorrect because, *inter alia*, only some of Pacific Bell's contractual obligations are contained in its tariff, and others that have been "detariffed" are not. In addition, plaintiffs argue that the tariff provides that "A bill shall not include any charges for service, equipment, or facilities not ordered by the customer."  Def's Request for Judicial Notice, Ex. J, Rule 2.1.9I.

The Court finds that as a pleading matter, plaintiff has sufficiently alleged a claim for breach of contract.  Defendants may be correct in their interpretation of the tariff, as well as of any "detariffed" obligations.  However, the Court finds that these arguments are not suitable for resolution at this stage

of the litigation, and that defendants may renew these arguments in a motion for summary judgment. Defendants' motion to dismiss this claim is DENIED.

### 2.    Tortious interference with contract

Plaintiff's fifth cause of action alleges that AT&T, Inc., AT&T Operations, and AT&T Services tortiously interfered with AT&T California's contractual obligations to plaintiff to bill her only for authorized charges.  Plaintiff alleges that these defendants knew of the contractual relationship between plaintiff and AT&T California and induced a breach or disruption of the contractual relationships causing plaintiff to suffer a loss.  FAC ¶¶ 124-27.

Defendants contend that this claim fails for the same reasons as the breach of contract claim, namely that plaintiff has not alleged any relevant contractual obligation with which the AT&T affiliates could have interfered.  For the reasons discussed *supra*, the Court finds that plaintiff has sufficiently alleged a breach of contract, and thus DENIES defendants' motion to dismiss this claim.

### 4.    Breach of fiduciary duty

Plaintiff's sixth cause of action is for "breach of trust."[6]  The FAC alleges that "[i]n connection with the opening of accounts for AT&T wireline service, AT&T received from the customer class members herein extremely confidential personal information including, *inter alia*, information concerning the customer's name, address, Social Security number and various other items of personal identifying information," that "AT&T received the foregoing in trust and was bound by fiduciary duties to hold that information in trust for the benefit of the customers providing such information," and that "Defendants' conduct here in using information it obtained in confidence to impose charges on customers in which charges Defendants had a direct and substantial interest was in violation of the duty of trust imposed on Defendants and [was] presumptively fraudulent."  FAC ¶¶ 129, 130, 133.

Defendants move to dismiss this claim on the ground that plaintiff has failed to allege the existence of a fiduciary relationship.  Defendants argue that as a matter of law, the mere receipt of

---

[6]  As noted *supra*, the parties' briefing regarding this claim makes clear that plaintiff is actually alleging a claim for breach of fiduciary duty.

confidential personal information does not establish a fiduciary duty.  *See Davies v. Krasna*, 14 Cal. 3d 502, 511 (1975) (submission of a written story in confidence to another "may impose upon [the other] a duty to refrain from unauthorized disclosure of the idea, but [it is] insufficient to impose upon him the fiduciary-like duties"); *City Solutions, Inc. v. Clear Channel Commc'ns, Inc.*, 201 F. Supp. 2d 1048, 1050 (N.D. Cal. 2002) ("The mere fact that in the course of their business relationships the parties reposed trust and confidence in each other does not impose any corresponding fiduciary duty in the absence of an act creating or establishing a fiduciary relationship known to law.").   In addition, defendants argue that while the receipt of confidential information may impose a duty to refrain from unauthorized disclosure of that information, the FAC does not allege that defendants improperly disclosed any confidential information to any third party.  *See Davies*, 14 Cal. 3d at 511.

An action for breach of fiduciary duty requires the plaintiff to allege the existence of a fiduciary relationship, defined under California law as "any relation existing between parties to a transaction wherein one of the parties is . . . duty bound to act with the utmost good faith for the benefit of the other party."  *Gilman v. Dalby*, 176 Cal. App. 4th 606, 612-13 (2009) (alteration in original) (quotation marks and citation omitted).  Traditional examples of fiduciary relationships include trustee and beneficiary, agent and principal, guardian and ward, and attorney and client.  *Id*. at 614; *Richelle L. v. Roman Catholic Archbishop*, 106 Cal. App. 4th 257, 270-71 (2003).

Here, plaintiff argues that a fiduciary relationship was created by virtue of the fact that plaintiff provided extremely confidential information to defendants, and thus defendants necessarily received that information in trust.  Plaintiff argues that defendants breached that trust by using that information to impose charges on customers such as plaintiff to further their own financial interest.  However, plaintiff does not cite any authority for the proposition that a fiduciary relationship exists whenever a customer provides confidential information to a company, and the cases cited by plaintiff are distinguishable.  In *Brown v. Wells Fargo Bank NA*, 168 Cal. App. 4th 938, 960-61 (2008), the court held that under "the unique factual circumstances of this case" the bank owed a fiduciary duty to an elderly and frail couple where the evidence showed that bank, through a vice-president, "knowingly induced the elderly and increasingly frail couple to rely on it to handle their financial affairs . . . ."  Similarly, in *Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1580-81 (1994), the court held that there was evidence of a fiduciary

relationship between a doctor (the plaintiff) and another doctor (the defendant) who provided billing services for the plaintiff's medical practice because, *inter alia*, the parties' written agreement established an agency relationship, the parties worked together for years, and the defendant encouraged the plaintiff to rely on and trust him. Finally, in *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, C No. 07-554 JSW, 2007 WL 3231724, at *4-5 (N.D. Cal. Oct. 30, 2007), the court held that Sonoma Cheese Factory stated a claim for breach of fiduciary duty where it alleged that Sonoma Foods had undertaken to manage Sonoma Cheese Factory's trademarks, and where the parties had worked closely with each other and trusted in a father-son relationship they shared.

The Court concludes that plaintiff has not stated a claim for breach of fiduciary duty. Plaintiff does not allege facts demonstrating that the relationship between her and AT&T California rose to a fiduciary relationship. At most, she alleges that AT&T California was in possession of her confidential information and that the parties had a contractual relationship for the purchase and sale of wireline phone service. *See Parrish v. Nat'l Football League Players Ass'n*, 534 F. Supp. 2d 1081, 1097 (N.D. Cal. 2007) (under California law, "[m]ere contractual relationships, without more, do not give rise to fiduciary relationships"). The Court GRANTS defendants' motion to dismiss and GRANTS plaintiff leave to amend if she can allege facts that show the existence of a fiduciary duty.

### 5.   California Public Utilities Code § 2890

Plaintiff's seventh cause of action is against AT&T California/Pacific Bell only, for violation of California Public Utilities Code § 2980. Section 2980, provides, in relevant part,

(a) A telephone bill may only contain charges for products or services, the purchase of which the subscriber has authorized.

. . . .

(d)(1) A billing telephone company shall clearly identify, and use a separate billing section for, each person, corporation, or billing agent that generates a charge on a subscriber's telephone bill. A billing telephone company may not bill for a person, corporation, or billing agent, unless that person, corporation or billing agent complies with paragraph (2).

(2) Any person, corporation, or billing agent that charges subscribers for products or services on a telephone bill shall do all of the following:

(A) Include, or cause to be included, in the telephone bill the amount being charged for

United States District Court
For the Northern District of California

each product or service, including any taxes or surcharges, and a clear and concise description of the service, product, or other offering for which a charge has been imposed.

(B) Include, or cause to be included, for each entity that charges for a product or service, information with regard to how to resolve any dispute about that charge, including the name of the party responsible for generating the charge and a toll-free telephone number or other no cost means of contacting the entity responsible for resolving disputes regarding the charge and a description of the manner in which a dispute regarding the charge may be addressed. Each telephone bill shall include the appropriate telephone number of the commission that a subscriber may use to register a complaint.

Cal. Pub. Util. Code § 2890 (a), (d).

Defendants first assert that "[A]lthough a subscriber may bring a court action for damages when Section 2890 is violated (pursuant to Pub. Util. Code § 2106), no provision of the Public Utilities code authorizes an action to 'overhaul' a telephone company's third-party billing system (*e.g.*, injunctive relief) based upon such violation." Motion at 15:17-21. It is not clear from the FAC that plaintiff is seeking injunctive relief pursuant to § 2890, as the FAC only specifically seeks actual and exemplary damages under this claim. FAC ¶ 144. In any event, as explained *supra*, the Court has held that plaintiff's state law claims for injunctive relief are within the exclusive jurisdiction of the CPUC.

Plaintiff alleges that AT&T California violated § 2890(a) "since its telephone bills contained charges for products and services, the purchase of which Plaintiff and the Sub-Class did not authorize." FAC ¶ 139. Defendants also contend that plaintiff has not sufficiently alleged a violation of § 2890(a) because under § 2890(e) a charge is not presumed to be unauthorized until a customer makes a complaint, and the FAC does not allege that plaintiff filed a complaint. Section 2890(e) states:

If an entity responsible for generating a charge on a telephone bill receives a complaint from a subscriber that the subscriber did not authorize the purchase of the product or service associated with that charge, the entity, not later than 30 days from the date on which the complaint is received, shall verify the subscriber's authorization of that charge or undertake to resolve the billing dispute to the subscriber's satisfaction.

Cal. Pub. Util. Code § 2890(e). Defendants argue that plaintiff does not explicitly allege that she complained to Pacific Bell about the disputed Voicemail Club charges and that Pacific Bell failed to provide proof of authorization or undertake to resolve the dispute. However, the complaint alleges that plaintiff notified AT&T that the charges were unauthorized. FAC ¶ 60. Moreover, there is nothing in the statute that requires that a plaintiff go through a dispute resolution process before pursuing her remedies under § 2890(a). Accordingly, the Court finds that plaintiff has stated a claim under § 2890(a).

United States District Court
For the Northern District of California

1    Plaintiff also alleges that AT&T California violated the disclosure-related requirements of

2    § 2890(d) by "systematically and uniformly fail[ing] to include 'a clear and concise description of the

3    service, product, or other offering for which a charge has been imposed' or 'a description of the manner

4    in which a dispute regarding the charge may be addressed.'"   FAC ¶ 141; *see also id.* ¶¶ 54-55.

5    Defendants contend that these allegations are conclusory.

6    The Court disagrees and finds that the plaintiff has sufficiently stated a claim for violation of the

7    disclosure requirements. Plaintiff has also alleged that certain key pieces of information are missing,

8    including the date the charges were authorized, the manner in which they were authorized, the name of

9    the person authorizing the charges, and how to address complaints relating to third-party charges. *See*

10   *id.* ¶¶ 54-55. These allegations are sufficient to withstand a motion to dismiss, and therefore the Court

11   DENIES defendants' motion to dismiss this claim.

12

13                           **6.    Cal. Bus. & Prof. Code § 17200**

14   Plaintiff's eighth cause of action alleges a violation of the California Unfair Competition Law

15   ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* The UCL defines unfair competition to include "any

16   unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Plaintiff

17   alleges that defendants violate the UCL by (1) engaging in unlawful conduct, including violations of

18   Public Utilities Code § 2890 (FAC ¶ 147), (2) engaging in acts of unfair competition, including

19   obtaining money from plaintiff for unauthorized charges (FAC ¶ 148), and (3) engaging in deceptive

20   business practices (FAC ¶ 149).[7]

21   Defendants first contend that the UCL claim fails because plaintiff has not adequately alleged

22   any unlawful conduct. However, as discussed *supra*, plaintiff has sufficiently alleged a claim under

23   CPUC § 2890, and therefore plaintiff has stated a claim under the UCL for "unlawful" business

24

25        [7] An action under the UCL is equitable in nature, and prevailing plaintiffs are limited to
     injunctive relief and restitution. Cal. Bus. & Prof. Code § 17203 (West 2008); *Korea Supply Co. v.*
26   *Lockheed Martin Co.*, 29 Cal. 4th 1134, 1144 (2003). While the Court has concluded that plaintiff's
     claims for injunctive relief are within the exclusive jurisdiction of the CPUC, the Court finds that
27   plaintiff's claims for restitution under the UCL are akin to a claim for damages for purposes of the
     jurisdictional analysis because restitution for past violations does not implicate the CPUC's regulatory
28   authority.

United States District Court
For the Northern District of California

practices.

Next, defendants argue that plaintiff fails to state a claim for violation of the UCL under the "unfair" prong.  Defendants characterize plaintiff's claim as challenging "AT&T's allegedly 'unfair' practice of not having the type of authorization procedures for third-party billing that Plaintiff believes should be implemented."  Motion at 17:28-18:2.   Defendants contend that because the CPUC has already specifically considered and rejected these procedures, as a matter of law defendants' conduct cannot be "unfair" under the UCL.  *See Webb v. Smart Documents Solutions, LLC*, 499 F.3d 1078, 1082 (9th Cir. 2007) ("[I]f we determine that the agency responsible for implementing [the regulatory scheme] intended to permit [defendant]'s conduct, it cannot be 'unfair' under Section 17200."). However, as plaintiff correctly notes, the "unfair" practice that plaintiff is challenging is cramming, not defendants' failure to use any particular authorization procedures.  The Court finds that plaintiff has sufficiently alleged a UCL claim based on the unfair practice of cramming.

Finally, defendants contend that plaintiff has not alleged a UCL claim based on a "fraudulent" business practice because the FAC does not allege reliance.  A business practice is "fraudulent" within the meaning of the UCL if "members of the general public are likely to be deceived."  *Comm. on Children's Television v. Gen. Foods Corp.*, 35 Cal. 3d 197, 211 (1983) (internal quotations omitted). "[W]hile a plaintiff must allege that the defendant's misrepresentations were an immediate cause of the injury-causing conduct, the plaintiff is not required to allege that those misrepresentations were the sole or even the decisive cause of the injury-producing conduct."  *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009).

Defendants argue that the complaint does not allege that *plaintiff*, as opposed to consumers in general, was misled by her telephone bill or any other alleged misrepresentation of Pacific Bell. Defendants assert that the complaint only alleges that plaintiff noticed the two Voicemail Club charges, that those charges were paid through the automatic bill-pay feature she utilized, and that Pacific Bell has not refunded the amount despite being notified that the charges were unauthorized.  The Court agrees that the complaint does not allege that defendants' "misrepresentation was an immediate cause of the injury-producing conduct."  *Id.* at 326.  The complaint does not allege that plaintiff was misled by defendants' conduct, or that any misrepresentation caused her injury.  It is not sufficient to allege that

other consumers have been misled by defendants' allegedly fraudulent business practices. *See id*. at 315 (named plaintiff in UCL case must allege reliance in order to establish standing).

Accordingly, the Court DENIES defendants' motion to dismiss the UCL claim to the extent that claim is predicated on "unlawful" and "unfair" practices, and GRANTS the motion with leave to amend to the extent the claim is based on "fraudulent" practices.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is GRANTED in part and DENIED in part.   (Docket No. 44).   The Court GRANTS the parties' motions to submit additional authority. (Docket Nos. 66, 80, 81 & 85).   **If plaintiff wishes to amend the complaint in accordance with this order, the amended complaint must be filed no later than February 18, 2011.**

**IT IS SO ORDERED.**

Dated:   January 28, 2011

_____
SUSAN ILLSTON
United States District Judge