1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3         BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE

4    -------------------------------)
                                     )
5    JOY NWABUEZE, individually and  )
     on behalf of a class of         )
6    similarly situated individuals, )
                                     )
7                        Plaintiffs, )
                                     )
8       v.                           )   No. C 09-1529 SI
                                     )
9    AT&T, INC., et al.,             )
                                     )
10                      Defendants.  )   San Francisco, California
                                     )   Friday, November 15, 2013
11   -------------------------------)      (28 pages)

12

13                   TRANSCRIPT OF PROCEEDINGS

     APPEARANCES:
14

15   For Plaintiffs:        Jacobs, Kolton, Chtd.
                            55 West Monroe Street
16                          Suite 2970
                            Chicago, Illinois 60603
17                     BY:  JOHN G. JACOBS
                            BRYAN G. KOLTON
18                          DAVID SCHACHMAN

19   For Defendants:        Pillsbury, Winthrop,
                               Shaw, Pittman, LLP
20                          Four Embarcadero Center
                            22nd Floor
21                          San Francisco, California 94105
                       BY:  ROXANE ALICIA POLIDORA
22
                            AT&T Service, Inc.
23                          Legal Department
                            525 Market Street
24                          Room 2005
                            San Francisco, California 94105
25                     BY:  WALID SAMIR ABDUL-RAHIM

```
1    APPEARANCES (cont.):

2

     For the FTC:            Federal Trade Commission
3                            Bureau of Consumer Protection
                             600 Pennsylvania Avenue, N.W.
4                            Mailstop M-8102B
                             Washington, DC 20580
5                       BY:  REENAH LILLIAN KIM

6    Also Present:           RICHARD GOLDBERG (via telephone)
     (Int. Party)            Consumer Protection Branch
7                            US DOJ
                             450 Fifth Street, N.W.
8                            Washington, DC 20001

9    Also Present:           Lieff, Cabraser
                             275 Battery Street
10                           29th Floor
                             San Francisco, California 94111
11                      BY:  ROGER N. HELLER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Friday, November 15, 2013

2                                                    (10:35 a.m.)

3        (In open court)

4            **DEPUTY CLERK:**  Calling Civil 09-1529, Nwabuezze vs.

5    AT&T.

6         And, Judge, I need to get one attorney on the phone.

7            **THE COURT:**  Who are we getting on the phone?

8            **DEPUTY CLERK:**  Richard Goldberg.

9            **MR. JACOBS:**  Good morning, your Honor, John Jacobs on

10   behalf of the class.

11           **MS. POLIDORA:**  Roxane Polidora for AT&T.  And with me

12   today is Mr. Walid Abdul-Rahim for AT&T.

13           **THE COURT:**  Are your folks going to say anything?

14           **MR. JACOBS:**  My colleagues are co-class counsel Bryan

15   Kolton and David Schachman.

16           **DEPUTY CLERK:**  This is Tracy with Judge Illston's

17   chambers.  Can you state who you represent, please?

18           **MR. GOLDBERG:**  Yes, the United States of America.

19           **THE COURT:**  Good morning, Counsel.  This is Judge

20   Illston.  I'm here with counsel for the plaintiffs in this

21   case, and counsel for the defendant.

22           **MR. GOLDBERG:**  Good morning, your Honor.

23           **THE COURT:**  Good morning.  This is the motion for

24   final approval of the class settlement and approval of the fee

25   request.  I had a few questions first for counsel in this

```
1    case, and then I'll be happy to hear anything that counsel for
2    the United States of America wants to add.  But what is an
3    enhanced service as opposed to some other kind of service?
4           MR. JACOBS:  I will yield to AT&T to state it more
5    accurately.  But it is a non-basic telephone service.  For
6    instance, diet plans, astrology, web-hosting -- all of these
7    things are enhanced services.
8           THE COURT:  What's a phone service but not an
9    enhanced phone service?
10          MR. JACOBS:  Could you say that again?
11          THE COURT:  You said there's going to be a schedule
12   of enhanced, and enhanced ones are not going to go forward,
13   and AT&T will explain the difference, no longer allows
14   enhanced services, and it will agree to provide customers an
15   informational bulletin regarding the kinds of third-party
16   billing that is still permitted.  So what kind of third-party
17   billing is still permitted?
18          MR. JACOBS:  For instance, I believe they will
19   continue to provide Earthlink, AOL, certain long-distance
20   carriers -- those will continue.  The enhanced services, I
21   think that's one of those marketing names.  It's also called,
22   quote, miscellaneous services.  And those are the kinds of
23   things that that have caused all the problems.  Our client, I
24   believe, was billed for a voicemail box when she already had
25   it.  And I can't remember the other kinds of charges, but
```

```
1    these things -- as I said, they run the spectrum from

2    astrology to web-hosting, as in 821.

3              THE COURT:  Right.  Miss Polidora?

4              MS. POLIDORA:  Yes.  I wanted to clarify:  Enhanced

5    services actually does include AOL and many legitimate

6    businesses, banks, Earthlink.  They're all enhanced services.

7    Anything Internet-based, essentially.

8              THE COURT:  And that won't be permitted any longer?

9              MS. POLIDORA:  We have already exited that business

10   last spring.

11             THE COURT:  So what might be third-party billing

12   policy.

13             MS. POLIDORA:  The only thing that remains is toll

14   charges.  Toll services.

15             THE COURT:  So enhanced is anything non --

16             MS. POLIDORA:  Toll.

17             THE COURT:  Toll.

18             MR. GOLDBERG:  Can I interject here?

19             THE COURT:  Every time, you need to say your name so

20   the court reporter can get it.

21             MR. GOLDBERG:  Yes, your Honor.  This is Richard

22   Goldberg representing the United States of America.  And I

23   appreciate your allowing me to appear by phone.

24       I could be wrong about this, but my understanding was AT&T

25   was going to continue to bill for what are called
```

1    telecommunications services as distinguished from enhanced

2    services.  Telecommunications services could include things

3    like voicemail services -- I'm happy to be contradicted by

4    AT&T's counsel if that's not the case.  But I was under the

5    impression that telecommunications services that dealt with

6    the phone in some way would still be subject to third-party

7    billing on AT&T bills.

8         **MS. POLIDORA:**  That's not correct.  It's only toll,

9    directory assistance.  There was one -- talking about

10   voicemail services?  No, we've exited that business.

11        **MR. GOLDBERG:**  Okay.  I appreciate your clarifying

12   that for me.

13        **MS. POLIDORA:**  Thank you.

14        **THE COURT:**  Thank you.

15      What's the last date for filing a claim and the last date

16   for requesting a statement of your prior bills?

17        **MR. JACOBS:**  The last date for requesting a bill is

18   December 2.  Then the last date for filing a claim is the

19   later of December 2 or 30 days after you are sent your billing

20   summary.  So there could be people getting billing summaries

21   in January or February and having 30 days to file.  So it

22   could go out into March.

23        **THE COURT:**  Okay.  And one other question I have:  So

24   the data that we have now that you've provided, having to do

25   with --

1          **MR. JACOBS:**  I can tell where you we are now.

2          **THE COURT:**  That would be good.  Because it's --

3          **MR. JACOBS:**  As of the end of last week,

4    approximately $32 million in claims had been filed for claims

5    under $250,000.  There are quite a few claims in excess of

6    that.  But we're not counting them because some of them are

7    just people writing down, you know, silly numbers.  But we do

8    know that there will be claims, very substantial.  For

9    instance, in the Verizon case, we had one school district that

10   filed a valid claim for $1.2 million.  And we know that some

11   very large billing summaries have just gone out to some

12   Fortune 100 companies, and I don't think they filed their

13   claims yet.  But there are substantial things out there.

14       And as of -- and that --

15         **THE COURT:**  So of the 32 million, do you know yet

16   whether any of those claims is going to be objected to?

17         **MR. JACOBS:**  No, we don't know.  We don't know.  And

18   I should say, your Honor, that number relates to about 80

19   percent of the claims that have been filed.  In other words,

20   there are another 18 or 20 percent that haven't yet been

21   processed and are not included in that $32 million number.

22         **THE COURT:**  All right.  One thing you could do for me

23   that would be helpful, and I don't know if it would be --

24   whatever would work for you -- twice a month, once a week,

25   twice a month, I'd like a, just a statement of how many claims

```
1    have been -- how many billing summaries were requested and

2    sent, and if there are some that have been requested and not

3    sent, I'd like to know that.  And how many claims have been

4    filed.  And how many challenges, if any, have been filed.

5            MR. JACOBS:  Well, challenges won't start until 120

6    days after the December 2 date.  But I can tell your Honor

7    that some, I believe 800 -- over 800,000 billing summaries

8    have been requested.  And that -- no, I'm lying.  Over 500,

9    over 500,000.

10           THE COURT:  That's what you had said in your papers.

11   And December 2nd is the last date for ask for it.  By

12   December 2nd you'll know the universe, right?

13           MR. JACOBS:  Right, we'll know then.  And there are

14   some number I believe in the 40,000 range that are being

15   processed.  Because it's quite a procedure for AT&T to go

16   through all these bills and then get the information digested

17   for people.  So there's about 40,000 in process.

18           THE COURT:  It's that that I'd like to be kept up to

19   speed on, if I could.

20           MR. JACOBS:  Okay.

21           THE COURT:  And, as I say, I don't mean to burden you

22   unduly, but it would help me to know what those numbers look

23   like.

24           MR. JACOBS:  Absolutely.  Absolutely.

25           THE COURT:  Okay.  And then my other question is
```

1    this:  Jumping ahead to the fees -- and in a minute I'll give

2    people an opportunity to address the question of whether the

3    settlement should be approved itself -- but on the fees,

4    they're keyed in in some way to the Moore case, right?

5              **MR. JACOBS:**  Yes.

6              **THE COURT:**  So what am I supposed to do about that?

7    Because it hasn't been decided, and there's no particular end

8    in sight.

9              **MR. JACOBS:**  I believe your Honor can appropriately

10   award us, say, I hereby award plaintiff's counsel the lesser

11   of "X" dollars -- I hope it's 5.5 million; or whatever is

12   awarded in the Moore case.  Frankly, we're expecting a

13   decision any day now.  Judge Corley heard argument, asked for

14   some supplemental briefs, got them, and said she would rule

15   very quickly.  So we expect to see something imminently.

16             **MS. POLIDORA:**  Your Honor, if I may address that

17   point.  You're correct that Section 14(a) of the settlement

18   agreement is now inconsistent with what the parties

19   anticipated would happen.  We thought that the Moore decision

20   would have come out by now.  We would request that we could

21   approach it two ways, but we do think it needs to be addressed

22   formally, and that would either be by stipulation and order

23   between the parties and the court, changing that part of the

24   settlement -- or it could be in the Court's final approval

25   order -- that no fees will be awarded until the later of the

1    effective date of this judgment or the effective date of the

2    Moore decision on fees, whichever is later.

3         **MR. JACOBS:**  Your Honor, that's a sidetrack, but I

4    will say that wasn't the agreement we made.  And –– for

5    instance, under that proposal, if, God forbid, the Verizon

6    case ultimately did not become final, that means we don't get

7    paid?  I don't think so.  I mean, I think, your Honor, this is

8    something that will take care of itself.

9         **THE COURT:**  I think it will.  But you can see that if

10   you think too closely about it, it could get bollixed up.

11        **MR. JACOBS:**  It could, and if it does, we can address

12   it, but I don't think now is the time.

13        **THE COURT:**  Well, perhaps Judge –– I mean maybe Judge

14   Corley will act with dispatch.  I'm just concerned that

15   then –– does that have to go back up to Judge Armstrong?  And

16   I don't know what happens there.  And I don't know who's going

17   to be complaining about it.

18        **MS. POLIDORA:**  I understand it is going to go back to

19   Judge Armstrong.

20        **MR. JACOBS:**  It doesn't have to.  If anybody takes

21   a –– she's very clear in her –– in the transcript that, you

22   know, Judge Corley will decide it.  And if somebody takes an

23   appeal to me, then so be it.

24        **THE COURT:**  Okay.  Well, thank you.  That helps me

25   somewhat.

1    All right. First, now, let's talk about the settlement

2  itself. I have reviewed all the materials that you've given

3  me. I've reviewed the materials that were provided by the

4  United States of America through the DOJ and the FTC, and I've

5  reviewed the materials concerning objections. I'm prepared at

6  this time to overrule all the objections and approve the

7  settlement, but I'll be happy to hear anything you want to

8  add.

9    Mr. Jacobs?

10    **MR. JACOBS:** No, your Honor. I know that you've read

11  everything. This is -- as I told you at the preliminary

12  approval hearing, this is a settlement that I'm proud of, and

13  I believe the Court has every reason to be proud of. This is

14  going to actually put money in the pockets of customers. And

15  I predict more money than all the cases in the last 15 years

16  combined, excluding the Verizon case that we just resolved.

17  It does something that, except for the Verizon case, has never

18  been done. It provides people free billing summaries so they

19  know -- they're not left on their own. The response, I

20  believe, has been overwhelming.

21    The concerns expressed by the government about, would

22  anyone read the notice, would anyone understand the notice,

23  would anyone participate, has been answered. They have read

24  it, they have participated, they're continuing to. I'm

25  advised that -- by the settlement administrator that they're

1    currently getting 8,000 pieces of mail a day, and they're

2    getting about 8,000 claims a week now, and it's picking up,

3    because the deadline is approaching, and all these billing

4    summaries have started going out.  So it is being very widely

5    participated in.  You had 25 pieces of paper that, out of an

6    abundance of caution, we included as possible objections, out

7    of 23 million.  That's one ten thousandth of a percent.

8         The class has overwhelmingly supported this and

9    participated in it.  And I believe it very much merits -- you

10   know, we think back, Judge, to the first day I appeared before

11   you on the motion to dismiss, and it addressed -- defendant's

12   motion to dismiss had restated the RICO claim.  And your

13   Honor, on your own, said, You know, I was just thinking about

14   that this morning.  How are you going to serve by class?  And

15   that's the problem that has been faced all along.  These cases

16   do not get certified.

17        I believe we have good arguments that should, particularly

18   looking at Judge Henderson's case in Herrera, but you'd have

19   to --

20             **THE COURT:**  23 million is a lot of people.

21             **MR. JACOBS:**  Yes, it is.  You're right.  There's no

22   question.  It's a very, very difficult thing.  And it would

23   have been imprudent of us, I believe, to not make a settlement

24   like this if we could.  I'm very proud of it.  I think it

25   demands the Court's final approval.

1      I'll be willing to speak to anything else.

2           **THE COURT:**  Miss Polidora, do you want to be heard?

3           **MS. POLIDORA:**  No, your Honor.

4           **THE COURT:**  Mr. Goldberg, did you want to be heard?

5           **MR. GOLDBERG:**  Briefly, your Honor.  I think our

6  brief speaks for itself.  It's -- there's no question that

7  there will be some consumers, a number of consumers that will

8  be reimbursed pursuant to the settlement.  But the question is

9  whether there are many, many, many consumers that could in

10  relatively easy fashion be afforded relief as well.

11      The notice we believe does not communicate to many

12  consumers the fact that there is the possibility of

13  reimbursement under the settlement.  The nature of this case

14  is unique in that there are few, if any, class action lawsuits

15  that we know of where the offense, where the violation was

16  because of consumers not noticing the charges in a phone bill

17  or in a bill itself.  And as a result, there's a fundamental

18  problem with notifying consumers via billing insert.  I'm sure

19  you saw our argument to that extent in our brief.

20           **THE COURT:**  I did.

21           **MR. GOLDBERG:**  So I won't really go further on that.

22      Again, it would be very simple for AT&T, in communicating

23  with consumers, to notify them that they had been charged

24  third-party charges in their bill, and that these are what

25  they were, and if you believe that those charges are

1    incorrect, then you should initiate your process down the road

2    to trying to get reimbursement.  Instead, the notification

3    doesn't do that.  Instead it says, We're not telling you

4    whether you've been charged in the past.  We're just telling

5    you you might have been charged, and that might have not have

6    been sufficient.  So consumers are left to wonder or to

7    check -- you know, for those consumers that maybe keep their

8    old bills, they can look back.  But for the probably vast

9    majority of consumers who don't keep their bills, they're left

10   to wonder whether they might have had a 15 or a 20 or a $30

11   charge on their bill at some point in the past and whether

12   they should take their time to go down this long and arduous

13   process of trying to determine, A, whether they were charged,

14   and, B, whether it was a correct charge or not.

15        Last thing is this uncertainty in terms of the effect of

16   the settlement.  Whether this could have an effect on future

17   government ability to collect restitution for consumers would

18   just be flat wrong.  If that was the effect of what was going

19   on here, it would be very simple for the parties to disagree

20   that this lawsuit should have no effect on consumer's ability

21   to get restitution via a government action.  They haven't done

22   that.  And they refuse to do that.  And again, it would be

23   very simple for them to say, unless -- look, if a consumer

24   actually got a refund from this class action, and that was a

25   valid refund, there's no reason why a government action should

```
1    get them a second refund.  But if this class action did not
2    produce a refund for a consumer and it's later determined that
3    that consumer was harmed by cramming, then why wouldn't that
4    aggregator and/or the merchant who committed the cramming have
5    to pay restitution?
6         Again, it would be very simple for the parties to say, We
7    agree that this lawsuit should have no effect on those
8    circumstances.  And they just haven't done that.
9         So for all those reasons, we believe that the settlement
10   is -- really turns out not to be fair to consumers.
11            THE COURT:  Mr. Goldberg, is there any likelihood
12   that the FTC or the DOJ or anybody else is actually going to
13   seek and obtain restitution for the -- for these folks?
14            MR. GOLDBERG:  I can't speak to any current
15   investigations.  I can't confirm or deny whether the
16   Department of Justice has any ongoing cramming investigations
17   of merchants or aggregators, much less know whether any
18   particular U.S. Attorney's offices have investigations.  But
19   the FTC -- I'm sorry, I'm not there.  The FTC is there?
20            THE COURT:  Well, it didn't make an appearance.
21            MR. GOLDBERG:  Oh.
22            THE COURT:  She's just -- oh, come on in.
23            MR. GOLDBERG:  The FTC has a current action against
24   an aggregator named BSG, a massive contempt action for -- I
25   believe it's 10's or 100's of millions of dollars, and that
```

1   is -- I have not heard the status of that within the last

2   month or so.  But last I heard, that was ongoing.  And there

3   is ultimately a -- we consider it to be a good possibility

4   that there would be restitution ordered as a result of that

5   case.

6           **THE COURT:**  Okay.  Thank you.

7       Does the FTC want to make a statement?

8           **MS. KIM:**  We would.  Thank you, your Honor.

9           **THE COURT:**  Let me say -- I'm going to interrupt this

10  proceeding for a second.  The criminal calendar, as a

11  practical matter is not going to begin until 11:30, so those

12  of you here for that, we're not going to be able to start for

13  a few more minutes.  Thank you.

14          **MS. KIM:**  I'm an attorney for the Federal Trade

15  Commission, Washington, D.C.  I appreciate the opportunity to

16  speak here.

17      The settlement releases virtually everyone involved in

18  this cramming case, and this is one of the key concerns that

19  the Federal Trade Commission had, which is in part why we

20  filed our amicus.  It may have an impact on law enforcement

21  efforts.  In fact, this very settlement is actively

22  interfering with a law enforcement action now, as counsel for

23  the DOJ just referenced.  The FTC is currently litigating a

24  contempt action against --

25          **THE COURT:**  That's a law enforcement action, you say?

1          **MS. KIM:**  Yes.  The FTC's currently litigating a

2    contempt action against BSG, one of the largest billing

3    aggregators in the nation, and it's an aggregator that's one

4    of the entities covered by the release in this class action.

5    And in that case, BSG is arguing, based on this settlement

6    agreement and the release that it contains, that the FTC

7    cannot recover any monetary redress for consumers, regardless

8    of whether they filed a claim in this class action or, much

9    less, got any of their money back.  And to update the Court on

10   the status of that action, it is actually -- I believe they

11   are closing today, but they have -- they are in week two right

12   now of the trial.  This is a case in which BSG was already

13   under an existing order regarding these very practices, and in

14   violation of that order.

15          **THE COURT:**  Well then, there's going to be lots of

16   remedies against BSG independent of restitution to plaintiffs,

17   right?  You could presumably get fines or sanctions for

18   contempt?

19          **MS. KIM:**  This is one of the issues here.  In that

20   action, this contempt action against BSG which is being

21   handled by the federal court in Texas, the FTC is seeking

22   monetary redress for consumers, in part.  I mean, it is a

23   sanction for their violation of the order, but it's also --

24   the objective is to make consumers whole, these consumers that

25   were injured by the fraudulent billing practices.  And what's

1   happening here is that BSG in that case has made this very

2   argument to the court there, which is that the settlement

3   agreement in this case has a preclusive effect.  They are

4   arguing -- of course, we disagree with BSG's argument.

5             **THE COURT:**  I would disagree with them entirely as

6   well.

7             **MS. KIM:**  But it's very troubling they're arguing the

8   FTC, because BSG name appears as one of the released entities.

9   On that basis, they're arguing that BSG cannot recover

10  monetary redress for contempt of that order.

11            **THE COURT:**  That seems to me like a ridiculous

12  argument.  Doesn't that sound ridiculous to you?

13            **MS. KIM:**  That is our position, your Honor.  And

14  that's why we are particularly troubled, because in this case,

15  the very same plaintiff's counsel had negotiated a similar

16  class action settlement in the class action against Verizon.

17  And in that instance, the aggregators were included under the

18  release, but they expressly modified that release to make

19  clear that it would not -- it would exempt any monetary relief

20  in a law enforcement action.  In other words, the release in

21  the Verizon class action was modified to make clear that the

22  FTC and any other government agency could still obtain full

23  restitution, disgorgement or compensation for consumers

24  without this lawsuit -- without that lawsuit having any

25  preclusive effect.  It's language that could have been put in

1    there in this agreement as well, and for some reason the

2    parties refused to do so.

3        And that's just -- you know, again, the FTC's position is

4    that this settlement agreement should not have any preclusive

5    effect, but there doesn't seem to be any reason why the

6    parties cannot add that simple modification, that simple fix

7    to the release to make it absolutely crystal clear that this

8    settlement should not have any type of preclusive effect on

9    those consumers, especially in a case such as this where you

10   have up to 23 million consumers and it's not entirely clear

11   that they will all go through all these steps, notice the

12   notice, request the billing summary, actually file a claim

13   that survives the challenge process and get their money back.

14            **THE COURT:**  Okay.  Thank you.

15            **MS. KIM:**  Thank you, your Honor.

16            **THE COURT:**  Did you want to be heard on that?

17            **MR. JACOBS:**  I'll be pleased to respond to any

18   particular specific questions you have.

19            **THE COURT:**  Just the last bit.  Why not do what you

20   did in Verizon and say, But this doesn't effect law

21   enforcement actions?

22            **MR. JACOBS:**  Your Honor, this is a settlement, and it

23   requires the agreement of both parties.

24            **THE COURT:**  Okay.  That's what I figured.  Okay.

25        Anybody else want to be heard about objections to the

1    settlement?

2              **MS. POLIDORA:**  Your Honor, would you like to hear our

3    response to the government's objections?

4              **THE COURT:**  If you'd like, sure.

5              **MS. POLIDORA:**  Just briefly, your Honor, this

6    settlement provides -- their objections seem to assume that

7    all 23 million people had unauthorized charges on their bills.

8    Obviously, it's AT&T's position that there are very few

9    unauthorized charges on very few bills.  Also, we have 100

10   percent compensation going to the class.  So of course the

11   whole chain of distribution, the AT&T, the clearing houses and

12   the third-party service providers need to be released in order

13   for 100 percent to be paid.  Because the clearing houses are

14   the ones who are mostly funding the settlement.  And if the

15   clearing houses don't get the release and if they don't have

16   the provision, if they have to put a provision that the

17   government can pursue the same restitution claims against

18   them, it's highly likely they will not fund the settlement.

19   Just wanted to clarify that.

20             **THE COURT:**  But it did in Verizon.

21             **MR. JACOBS:**  Different contracts.

22             **MS. POLIDORA:**  Verizon apparently had a different

23   indemnity agreement with their clearing houses.

24             **MR. JACOBS:**  We've looked at both, obviously.

25             **THE COURT:**  Thank you.  That matter will be

```
 1   submitted.

 2        Now, about the fees.  I am troubled by the Alphonse and

 3   Gaston issue with respect to the Verizon settlement, but I'll

 4   just have to figure out what to do about that.

 5        In addition, I have one overarching question, and then

 6   some specifics ones.  The big one is this:  There's a lot of

 7   similarities between this case and the Moore/Verizon case.

 8   How do I know who did what on what case and that there wasn't

 9   overlap and it's not being requested to be compensated on a

10   duplicative basis?

11        MR. JACOBS:  Besides the fact that we have filed

12   declarations with you under penalty of perjury that we sorted

13   this out and only count work on this case, and have made our

14   time sheets available if the Court wants them, I can represent

15   to your Honor that early on, conceptualizing the cases, the

16   work was common, and we cut it in half.  Thereafter, this case

17   took on a life of its own and that case took on a life of its

18   own.  And the negotiations were wildly different in

19   mediations.

20        And your Honor, you know how many times we came back to

21   you -- I came back to you -- and said, you know, we should

22   have this signed within a month.  You know.  Because I

23   believed it.  We had already agreed.  And AT&T was an

24   incredibly tough negotiator, and it would keep coming back and

25   keep coming back and keep coming back, and now the notice is
```

1   out there and the settlement is out there.  The work is

2   unique.  You know, you're helping these class members with

3   their issues.  We're working with AT&T with regard to all

4   kinds of stuff that always comes up about notices and, Wait a

5   minute, this seems to be a snag here that we need to work out,

6   so that people don't have a problem.  And they're very

7   different, as it turns out.

8       Early on, as I say, conceptualizing the cases and doing

9   the research is very similar.  And that's all I can tell you.

10  The parties made different arguments with regard to

11  particularly the RICO claims.  We negotiated injunctive relief

12  prior to your Honor's ruling that we couldn't get anywhere,

13  but that resulted, as your Honor saw, with a -- with the -- a

14  single aggregator saying, Our revenue's dropped $37 million

15  last year because of these new contracts that AT&T put out,

16  which are as a result -- that's what was required by our

17  negotiations.

18      Is that responsive, your Honor?

19          **THE COURT:**  It does.  It does.

20          **MR. JACOBS:**  And I should tell your Honor, at this

21  point, we're north of $6 million in time and expenses.  And

22  it's only going to increase.  So....

23          **THE COURT:**  All right.  And I have some less -- is

24  anybody here from Lieff Cabraser?

25          **MR. HELLER:**  Yes, your Honor.  Roger Heller.

1          **THE COURT:**  I was wondering:  What's a paralegal and

2    what's a clerk and what's litigation support and what's

3    research and why should any of that be paid on an hourly

4    basis?

5          **MR. HELLER:**  Well, typically, case clerks are first

6    or second year -- you know, some firms will call them

7    paralegals, but it's certain -- the more junior version of the

8    paralegal, and a paralegal.

9          **THE COURT:**  You mean a lawyer or not a lawyer?

10         **MR. HELLER:**  No, not a lawyer.  More like a junior

11   paralegal.  Whereas a paralegal's more like a senior

12   paralegal.  I believe in -- yeah, that's --

13         **THE COURT:**  Okay.  And how about litigation support?

14   What's that?

15         **MR. HELLER:**  Litigation support are the technical

16   people who manage the databases.  For example, document

17   databases.  They do other work such as -- you know, it varies

18   from case to case.  In this case, it was primarily managing

19   document databases and doing other work in terms of managing

20   data.

21         **THE COURT:**  They're employees.

22         **MR. HELLER:**  They are employees of the firm.  That is

23   correct.

24         **THE COURT:**  So why isn't that overhead?

25         **MR. HELLER:**  We typically bill it as an hourly basis.

1    It's approved generally in almost every case that we work on.

2    It is. And they're firm employees. They do a lot of

3    different work. But it's not the kind of work that you would

4    farm out necessarily to a third party.

5            **THE COURT:** No, that's what overhead usually is, is

6    people you keep on staff to do your work. But I think you've

7    told me what I need to know.

8            **MR. JACOBS:** May I add one thing to that?

9            **THE COURT:** Yes, but I have one last question.

10   What's research?

11           **MR. HELLER:** Well, we have employees at the firm who

12   do research work. So in this case, I don't know specifically

13   what they did, but -- I'd have to go back and look at the

14   record.

15           **THE COURT:** Would they be lawyers or other than

16   lawyers?

17           **MR. HELLER:** Our research employees are not lawyers.

18           **THE COURT:** No kidding.

19           **MR. HELLER:** Those are not lawyers. They do things

20   like -- an example would be wanting to see if there's a

21   similar case that's been filed, or, Can you go find -- it's

22   similar to paralegal work. But it's people who do sort of

23   paralegal work of a research nature.

24           **THE COURT:** Okay. Thank you. And the new ones do

25   junior paralegal work of a research nature and then the older

1   ones do senior paralegal work of a research nature?

2           MR. HELLER:  Paralegals do work that goes well beyond

3   research things, like organizing files, can be -- you know,

4   there's all kinds of things that paralegals do.  The

5   paralegal/case clerk distinction is more an internal thing

6   within the firm in terms of what we call them and when they

7   reach the level of paralegal.

8           THE COURT:  Okay.  All right.  Thank you.

9           MR. JACOBS:  What I was going to add, your Honor, is

10  this:  The settlement administrator in this case, I believe,

11  has been excellent.  They've spent over seven million minutes

12  on the phone with people.  They have live operators.  Give

13  AT&T credit.  They're paying for live operators.  But we get,

14  the lawyers get, a lot of calls from class members.

15          THE COURT:  I have no doubt.  I have no doubt that

16  that is true.  I have no doubt that that is true.  But that's

17  one of the reasons that courts can sleep well at night and

18  still give people $500 or $700 or $900 an hour for their time,

19  because they're not worth that, but they don't come by

20  themselves, they come with a whole law firm and with overhead,

21  so we understand that a large slice of that doesn't go into

22  the pocket of the lawyer but goes to pay for all the other

23  things that keep the firm going.  And I was just trying to

24  understand if maybe paralegals and research and that sort of

25  thing, and perhaps even answering phone calls, is part of what

1    the overhead ought to encompass.

2              MR. JACOBS:  That's what I wanted to say.  That's

3    where I was going with that.  That I believe that you don't

4    relegate class members to some clerk.  Lawyers respond to

5    those people.  And our firm consists of myself and my partner.

6    It's inappropriate, I believe, for us to spend our time at our

7    level responding to all calls.  You take some at the beginning

8    to kind of get a view from 5,000 feet of how the system's

9    working, but then we have retained contract lawyers to respond

10   to these people.  And I have specified that no firm will

11   charge more than $125 an hour for that work.  And that's how

12   it has gone in on the fees.

13             THE COURT:  Okay.  All right.  Thank you.

14       And I did want to say something else -- we're running out

15   of time here because I have two more cases we have to hear

16   before the criminal calendar -- but particularly in light of

17   the FTC and the DOJ issues that have been raised, I wanted to

18   say this:  I have always found this to be a challenging case,

19   and a complicated case.  Because AT&T is one of the sort of

20   overarching largest things we have in this country.  It is

21   regulated by all kinds of different entities and states and

22   regulators.  Its activities have grown over the century really

23   to be so complicated.  It's very hard for anyone to

24   understand, much less an outsider.  So this is a very

25   challenging case.  The legal theories were challenging.  23

```
1   million is an awful lot of people, and it would have been very
2   difficult, I think, to handle on a class basis.  Whether it
3   even would have happened, I don't know.
4       However, I think this is an excellent settlement.  I think
5   the lawyers have worked very hard to achieve it.  I think it
6   actually provides a substantial benefit to the American
7   public, because almost all of the American public is affected
8   by AT&T at this point, one way or another, so I think you're
9   all to be commended for that.  The money that's coming back
10  and the way that it's coming back is imperfect, but it's
11  pretty good.  I think it's unfortunate -- if there are
12  collateral consequences to other law enforcement actions, I
13  doubt they're going to be drastic because I can't think of any
14  good reason why this settlement should impair the ability of
15  law enforcement to seek fines or sanctions if people are -- if
16  companies have violated rules or regulations.  So I don't
17  think that that's a real problem.  It's a concern, but I think
18  in light of everything else that's provided in this
19  settlement, the settlement on balance is a fair and a good
20  one.  And it's not the kind of thing we often see.  It's much
21  more ambitious than that.  So I commend you for that.  I think
22  it's really a job well done and I'm appreciative.
23      Everything else is submitted, and I will get you an order
24  when I can.  I may get back to you if I need more information
25  on the fees.  And I also would like, maybe on -- every two
```

1    weeks, I'd like to know how many claims have been requested,

2    how many -- I mean, how many lists of charges have been

3    requested, how many claims have been filed, and what the

4    aggregate amounts are.

5           **MR. JACOBS:**  We will do that, your Honor.  We

6    appreciate your time.  You've been very gracious.

7           **THE COURT:**  Thank you.

8           **MR. GOLDBERG:**  Thank you, your Honor, for allowing me

9    to appear by phone.

10          **THE COURT:**  We're going to hang up on you now.  Thank

11   you, sir.

12          **MS. POLIDORA:**  Thank you, your Honor.

13          **THE COURT:**  Bye.

14      (Adjourned)

15                                    oOo

16

17

18                         CERTIFICATE OF REPORTER

19

20          I, Connie Kuhl, Official Reporter for the United
     States Court, Northern District of California, hereby certify
21   that the foregoing proceedings were reported by me, a
     certified shorthand reporter, and were thereafter transcribed
22   under my direction into written form.

23   SS:// Connie Kuhl  *Connie Kuhl*

24                  Connie Kuhl, RMR, CRR
                 Tuesday, November 19, 2013
25